Nos. 25-7461, 25-7467, 25-7469, 25-7824, 25-7869

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

GRANT HOUSE, et al.,
*Plaintiffs-Appellees,*

v.

PIPER WHITTY, et al.,
*Objectors-Appellants*

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Northern District of California, Oakland Division
Case No. 4:20-cv-03919-CW
The Honorable Claudia Wilken

## APPELLANTS' REPLY BRIEF

Leigh Ernst Friestedt
EQUITY IX, LLC
40 Mercer St., Suite 15
New York, NY 10013
(917) 513-5541
leigh@equityix.com

Jeffrey E. Faucette
SKAGGS FAUCETTE LLP
505 Montgomery St., 11th Floor
San Francisco, CA 94111
(415) 874-3181
jeff@skaggsfaucette.com

*Attorneys for Objectors-Appellants:* Piper Whitty, Ariana Amoroso,
Katherine McCabe Ernst, Scott Iannaccone, Abigail Leight, and
Reid Hinds Macdonald

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................iii

INTRODUCTION...........................................................................1

PROCEDURAL HISTORY………......................................................6

ARGUMENT.................................................................................7

I.    The District Court Abused its Discretion by Failing to Consider New Evidence of Irreparable Harm Caused by the Settlement………..........8

      A.    Roster Limits Caused Immediate, Irreparable Harm...……........9

          1. DSA Protections Failed to Prevent Harm…………...…….10

          2. The District Court's Assumption of Scholarship Increases was Speculative and Contradicted by the Record…..……13

II.    The District Court and Appellees Improperly Shifted To Procedural Standing Arguments to Avoid Substantive Harms………………......14

      A.    The District Court Never Found that Objectors-Appellants *Whitty et al.* Lacked Standing……………………………..14

      B.    The Amended Class Structure Made the "Incoming" Injunctive Relief Class Members' Right to Object Illusory……….….…16

      C.    Article III Standing to Object Differs from Standing to Appeal – *Devlin* Controls…………………………………………..21

III.    The Injunctive Relief Does Not Promote Interests Common to All Class Members………....……………………………...…22

      A.    Non-Revenue Athletes Seek Opportunities to Participate – Their Interests Differ from Athletes in Revenue-Producing Sports………………………………………………….......24

B. *Cohen v. Brown* Confirms that Participation Opportunities are Legally Protected – Not a Valid Procompetitive Rationale…..25

IV. Title IX Claims Are Not Meritless – The Injunctive Relief Perpetuates Sex-Based Discrimination and Violates the Constitution…………...29

A. Due Process Guarantees the Right to Object and Appeal – It Does Not Require an Objector to File a Lawsuit…………......30

B. A Recipient of Federal Financial Assistance Cannot Violate Federal Antidiscrimination Laws – Spending Clause..............32

C. The District Court is a State Actor and Violated the Equal Protection Clause by Continuing Sex-Based Discrimination...33

V. Pending Federal Legislation and NCAA Rules are Directly Related to the Injunctive Relief……………………………….……………...35

A. The Protect College Sports Act is Not "Rumored" – It is Legislation Directly Tied to the Injunctive Relief……….…..36

CONCLUSION.....................................................................................................37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................................1, 27

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
9 F.4th 1102 (9th Cir. 2021) ...............................................................25

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979)..............................................................................32

*Carter v. City of L.A.,*
224 Cal. App. 4th 408 (2014) ..............................................................31

*Churchill Vill., L.L.C. v. Gen. Elec.,*
361 F.3d 566 (9th Cir. 2004)...........................................................21, 31

*Craig v. Boren,*
429 U.S. 190 (1976)..............................................................................34

*Cohen v. Brown Univ.,*
16 F.4th 935 (1st Cir. 2021)............................................................25, 27–28

*Cohen v. Brown Univ.,*
991 F.2d 888 (1st Cir. 1993).................................................................27

*Devlin v. Scardelletti,*
536 U.S. 1 (2002)............................................................................20–22, 31

*Gebser v. Lago Vista Indep. Sch. Dist.,*
524 U.S. 274 (1998)...........................................................................30, 32

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998)................................................................6

*Hurd v. Hodge,*
334 U.S. 24 (1948)................................................................................34

*Moose Lodge No. 107 v. Irvis,*
407 U.S. 163 (1972)..............................................................................33

*N. Haven Bd. of Educ. v. Bell,*
456 U.S. 512 (1982)..............................................................................32

*Nat'l Collegiate Athletic Ass'n v. Alston,*
 594 U.S. 69 (2021) ................................................................................5

*Nat'l Collegiate Athletic Ass'n v. Smith*
 525 U.S. 459 (1999) ............................................................................36

*Ohio v. Am. Express Co.,*
 585 U.S. 529 (2018) ............................................................................24

*Ortiz v. Fibreboard Corp.,*
 527 U.S. 815 (1999) ..............................................................................1

*Phillips Petroleum Co. v. Shutts,*
 472 U.S. 797 (1985) ............................................................................30

*Shelley v. Kraemer,*
 334 U.S. 1 (1948) ................................................................................33

*Sosna v. Iowa,*
 419 U.S. 393 (1975) ............................................................................27

*Stone v. City & Cnty. of San Francisco,*
 968 F.2d 850 (9th Cir. June 25, 1992) ................................................34

*United States v. Virginia,*
 518 U.S. 515 (1996) ............................................................................34

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011) ..............................................................................6

*Ward Dixie v. Nat'l Life Ins. Co.,*
 595 F.3d 164 (4th Cir. 2010) ..............................................................23

**Statutes**

15 U.S.C. § 1 ............................................................................................24

20 U.S.C. § 1681 ..................................................................................5, 25

20 U.S.C. § 1681(a) ................................................................................32

20 U.S.C. § 1682 ..................................................................................5, 25

20 U.S.C. § 1683 ..................................................................................5, 25

20 U.S.C. § 1684 ..................................................................................5, 25

20 U.S.C. § 1685 ..................................................................................5, 25

20 U.S.C. § 1686 ...............................................................................5, 25

20 U.S.C. § 1687 ...............................................................................5, 25

20 U.S.C. § 1688 ...............................................................................5, 25

**Rules**

Fed. R. Civ. P. 23 .......................................................1, 5, 8, 20, 29, 30, 31

Fed. R. Civ. P. 23(b)(1) ..........................................................................21

Fed. R. Civ. P. 23(e)(5) ..........................................................................18

Fed. R. Civ. P. 23(e)(5)(A)................................................................30, 31

**Regulations**

34 C.F.R. § 106.41(a) (1999) ............................................................29, 30

34 C.F.R. § 106.41(c) .............................................................5, 25, 30, 32

34 C.F.R. § 106.41(c)(1) .........................................................................27

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 .....................................................................32

U.S. Const. amend. XIV................................................................33, 35

**Other Sources**

Charles Gasparino, *College Sports Are Spiraling Into Chaos—and Courts Are Making It Worse*, N.Y. Post (Apr. 26, 2026, at 12:46 ET), https://nypost.com/2026/04/26/business/charles-gasparino-college-sports-are-spiraling-into-chaos-and-courts-are-making-it-worse/............................3

Charlie Baker, *Face the Nation with Margaret Brennan*, CBS News (July 5, 2026) https://www.cbsnews.com/news/charlie-baker-ncaa-president-face-the-nation-transcript-07-05-2026/ ....................................................................29

Maria Cantwell, *An Arms Race in College Sports Could Sideline 500,000 Athletes*, The Washington Post (June 11, 2026) https://www.washingtonpost.com/opinions/2026/06/11/protect-college-sports-act-seeks-rein-collegiate-spending/....................................................2

Nick Saban, *Protect College Sports Act: Hearing on S. 4668 Before the S. Comm. on Commerce, Sci. & Transp.,* 119th Cong. 3 (2026), (prepared testimony) https://www.commerce.senate.gov/wp-content/uploads/meetings/36690a12-aa4c-e426-99ad-cc13df72e3b7/Nick-Saban-Testimony-6.3.2026_b1217e87-51d9-4583-a6f6-2d9fe31634a8-1.pdf .........................................................4

Protect College Sports Act, S. 4668, 119th Cong. (as reported on June 24, 2026)…………………………………..…………………………………36

S. Comm. on Com., Sci. & Transp., *Protecting College Sports: Supporting Student Athletes, Restoring Fair Competition, and Saving the Games Fans Love*, YOUTUBE (June 3, 2026), https://www.youtube.com/watch?v=4u0msJCaLdE ...............................3, 13

Student Compensation and Opportunity through Rights and Enforcement (SCORE) Act, H.R. 4312, 119th Cong. (July 24, 2025)……………....35, 36

Todd Graff, *.66%: What Penn State's Reporting Indicates About the Future of Women's Sports*, Christine Brown & Partners (Feb. 13, 2026), https://www.christinebrownsportslaw.com/news-insights/what-penn-states-reporting-indicates-about-the-future-of-womens-sports …………………..26

William McGurn, *The College Sports Crisis*, The Wall Street Journal (Nov. 24, 2025) https://www.wsj.com/opinion/the-college-sports-crisis-e4dcd41b# ...3

## INTRODUCTION

The record establishes a strong showing that the District Court abused its discretion by overruling objections and allowing the Second Amended Injunctive Relief Settlement ("Injunctive Relief") to continue. The Injunctive Relief is integrated with the Fourth Amended Stipulation and Settlement Agreement ("Settlement Agreement") governing the $2.6 billion in past damages ("Past Damages"). Together, they form the operative Settlement ("Settlement") that binds the Injunctive Relief Class for the next ten years. By continuing the Injunctive Relief without addressing the legal and structural harms identified in the record, the District Court entrenched a Settlement that continues to inflict irreparable harm.

Rather than address the evidence of ongoing and irreparable harm to thousands of student-athletes, the District Court and Appellees shifted the analysis to procedural standing, thereby avoiding any meaningful consideration of the concrete injuries caused by the Settlement. 1-WhittyER-8; ECF 29.1 at 29–33; ECF 31.1 at 28, 33; WhittyFER-77. By failing to consider material facts directly bearing on the Settlement's fairness, adequacy, and reasonableness, the District Court disregarded the rigorous scrutiny required by Fed. R. Civ. P. 23 and abused its discretion. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620–23 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848–49 (1999).

1

Class Counsel's assertion that the Settlement has transformed Division I sports "to the benefit of *all* DI athletes" is factually incorrect. ECF 29.1 at 13. One year after this purported "*extraordinary*" Settlement, the Injunctive Relief has unleashed billions of dollars into college athletics and accelerated an out-of-control arms race in football and basketball. ECF 29.1 at 27, 59; ECF 31.1 at 11, 38. Instead of producing broad-based benefits or expanding opportunities, the Injunctive Relief has done the opposite: it has concentrated power and money, destabilized Division I athletics, and inflicted widespread harm across non-revenue sports. 2-WhittyER-240–69, 272–308.[1]

Objectors-Appellants Piper Whitty, Ariana Amoroso, Scott Iannaccone, Abigail Leight, Katherine McCabe Ernst, and Reid Hinds Macdonald (collectively, "*Whitty et al.*") represent a substantial and largely overlooked segment of Division I student-athletes: participants in Olympic and other so-called "non-revenue" sports who comprise 75% of the Settlement classes. Yet the Settlement provides these athletes no meaningful benefits. 2-WhittyER-285–86; 3-WhittyER-632–33. Instead, its core provisions—roster limits and revenue-sharing—affirmatively harm them by imposing substantial new costs on universities and diverting

---

[1] Maria Cantwell, *An Arms Race in College Sports Could Sideline 500,000 Athletes*, WASH. POST (June 11, 2026), https://www.washingtonpost.com/opinions/2026/06/11/protect-college-sports-act-seeks-rein-collegiate-spending/.

resources to fund the $2.6 billion in Past Damages and the annual $20.5 million revenue-sharing payments. As a result, Division I institutions are predictably reducing support for women's and Olympic sports and concentrating resources in football and men's basketball.[2]

The consequences have been immediate and severe—college sports are now widely described as being in a "*crisis*."[3] At a Senate hearing on June 3, 2026, Senator Ted Cruz warned that the NCAA's shifting compensation model threatens the existence of "*tens of thousands*" of Olympic-sport opportunities, while placing numerous scholarships at risk.[4] Senator Maria Cantwell likewise testified that over 100 women's and Olympic-sport programs and more than 1,000 scholarships have already been eliminated, "*erasing roster spots to keep pace with out-of-control spending in football and basketball*."[5]

---

[2] Charles Gasparino, *College Sports are Spiraling into Chaos—and Courts Are Making It Worse,* N.Y. POST, (April 26, 2026 at 12:46 ET), https://nypost.com/2026/04/26/business/charles-gasparino-college-sports-are-spiraling-into-chaos-and-courts-are-making-it-worse/.

[3] William McGurn, *The College Sports Crisis*, WALL ST. J. (Nov. 24, 2025), https://www.wsj.com/opinion/the-college-sports-crisis-e4dcd41b.

[4] S. Comm. on Com., Sci. & Transp., *Protecting College Sports: Supporting Student Athletes, Restoring Fair Competition, and Saving the Games Fans Love*, at 34:05–34:20, YOUTUBE (June 3, 2026), https://www.youtube.com/watch?v=4u0msJCaLdE.

[5] *Id.* at 38:48–39:05, 39:24–39:05.

These concerns are not limited to lawmakers. Nick Saban, one of the most prominent figures in college football, acknowledged the growing threat facing women's and Olympic sports:

> Football and men's basketball generate most of a department's revenue, but college athletics is bigger than those two sports. Women's sports, Olympic sports, and other non-revenue sports create opportunities for thousands of young men and women. Those opportunities matter. They are part of what makes college athletics different from professional sports.[6]

Contrary to Appellees' assertions, these harms are neither hypothetical nor speculative; they are harming the student-athletes who make up the overwhelming majority of the Injunctive Relief Class. ECF 29.1 at 45, 53; ECF 31.1 at 52–53; 3-WhittyER-646–50.

The District Court and Appellees attempt to deflect responsibility by attributing these harms to the independent "*discretion*" of universities rather than to the Injunctive Relief itself. ECF 29.1 at 22, 26, 32, 35–37, 47; ECF 31.1 at 29–32, 45, 47, 49. That argument fails. The Settlement establishes the financial and structural framework that drives these outcomes. These consequences are neither hypothetical nor institution-specific; they flow directly and foreseeably from the Settlement's design. While schools have always had discretion to allocate financial

---

[6] *Protect College Sports Act: Hearing on S. 4668 Before the S. Comm. on Commerce, Sci. & Transp.*, 119th Cong. 3 (June 3, 2026) (prepared testimony of Nick Saban).

4

resources, manage rosters, and discontinue sports programs, they have never had the discretion to avoid mandatory compliance with federal antidiscrimination laws—specifically Title IX of the Education Amendments of 1972 ("Title IX"). 1-WhittyER-9; 20 U.S.C. §§ 1681-1688; 34 C.F.R. § 106.41(c).

This is precisely the concern Justice Kavanaugh anticipated in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 107–12 (2021) (Kavanaugh, J., concurring). In that landmark antitrust decision, the Supreme Court recognized that a compensation-based college sports model would raise significant legal and policy questions concerning non-revenue sports and Title IX compliance. Justice Kavanaugh's concurring opinion warned:

> If it turns out that some or all of the NCAA's remaining compensation rules violate the antitrust laws . . . [h]ow would paying greater compensation to student athletes affect non-revenue-raising sports? Could student athletes in some sports but not others receive compensation? How would any compensation regime comply with Title IX?
> *Id.* at 111.

The harms are the very risks identified in *Alston* and the same concerns Objectors-Appellants presented to the District Court. Yet neither the District Court nor Appellees meaningfully addressed the Settlement's foreseeable impact on women's and Olympic sports. Because these objections bear directly on the Settlement's fairness, adequacy, and reasonableness, Rule 23 required the District Court to confront them in a meaningful way. Its failure to address the foreseeable

risks identified or the concrete harms that emerged following implementation of the Injunctive Relief constitutes an abuse of discretion. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

## PROCEDURAL HISTORY

This Reply continues the procedural history already detailed in the Opening Brief and adds additional developments. ECF 20.1 at 15–22.

On October 14, 2025, Class Counsel opposed *Whitty et al.'s* objections to the continuation of the Injunctive Relief and argued objectors lacked standing, including Dominic Amoroso, who had submitted a written objection to the Injunctive Relief on behalf of his minor daughter, Ariana Amoroso. WhittyFER-77. On October 16, 2025, the District Court issued an order finding that Objector Dominic Amoroso lacked standing because he is a parent, not a class member. 2-WhittyER-271. In response, Mr. Amoroso filed a Motion for Leave to Amend the objection letter to substitute Ariana Amoroso, who had by then reached the age of majority, as the proper Objector. 2-WhittyER-240–49. On October 31, 2025, the District Court granted the Motion for Leave to Amend, accepted Ms. Amoroso's written objection, and authorized her attorney to appear on her behalf at the November 6, 2025, oral hearing. WhittyFER-75.

6

On April 20, 2026, Class Counsel filed a Motion to Enforce the Fourth Amended Stipulation and Settlement Agreement ("Motion to Enforce"). WhittyFER-57–74. On May 4, 2026, Defendants (NCAA and P5 Conferences) filed a motion to oppose Plaintiffs' Motion to Enforce. WhittyFER-40–56. On May 25, 2026, Objectors-Appellants filed a Motion to Intervene. WhittyFER-14–34. On June 4, 2026, the District Court denied the Motion to Intervene. WhittyFER-11–13. On June 5, 2026, Appellees filed a joint administrative motion requesting notice to prospective class members. WhittyFER-6–10. On June 9, 2026, the District Court granted the motion, and the objection deadline for Incoming class members was set for August 11, 2026. WhittyFER-4–5.

## ARGUMENT

Appellees ask whether the Objectors-Appellants (*Whitty et al.* and pro se Objector-Appellant Gracelyn Laudermilch) offered any reason for the District Court to discontinue the Injunctive Relief of this purportedly "*transformational settlement*"? ECF 31.1 at 66. The answer is unequivocally yes. The record demonstrates that the District Court abused its discretion by continuing the Injunctive Relief despite significant post-approval developments that undermine the factual and legal premises on which final approval rested. In addition to the issues detailed in the Opening Brief, this Reply identifies further examples that demonstrate a strong showing that the District Court abused its discretion:

1. **New Evidence of Ongoing Harm** – The District Court ignored post-approval evidence showing the Injunctive Relief is causing irreparable and continuing harm.

2. **Procedural Standing Used to Avoid Substantive Review** – The District Court and Appellees relied on procedural arguments to sidestep the substantive harms caused by the Injunctive Relief.

3. **No Common Interest** – The Class Representatives do not share a common interest with non-revenue Injunctive Relief members, whose primary concern is preserving an opportunity to participate.

4. **Sex-Based Discrimination** – The Injunctive Relief perpetuates sex-based disparities and raises serious Title IX and constitutional issues.

5. **Legislative Developments Undermine Enforcement** – Pending legislation threatens to weaken Title IX and impair female athletes' ability to enforce their civil rights.

Each of these issues independently demonstrates an abuse of discretion. Collectively, they confirm that continued enforcement of the Injunctive Relief cannot withstand the rigorous scrutiny required by Rule 23 and due process.

## I.   THE DISTRICT COURT ABUSED ITS DISCRETION BY FAILING TO CONSIDER NEW EVIDENCE OF IRREPARABLE HARM CAUSED BY THE SETTLEMENT

When the District Court approved the Settlement on June 6, 2025, it relied on several assumptions regarding how the Injunctive Relief would operate in practice. Subsequent events have disproven those assumptions. 1-WhittyER-137–41, 175–202. Over the last year, the Injunctive Relief has produced widespread and structural harms across Division I athletics, including roster cuts, scholarship losses, the elimination of women's and Olympic teams, failed DSA protections, Title IX

8

violations, and inequitable revenue-sharing payments exceeding the $20.5 million cap. 2-WhittyER-208–20, 227–32, 272–308; WhittyFER-41–46.

The resulting harms to student-athletes have been equally substantial. The Injunctive Relief has diminished educational opportunities, undermined athletic development, disrupted academic progress, imposed financial burdens, and harmed student-athlete well-being. 2-WhittyER-219–20, 272–308. These injuries were not speculative. They materialized after approval of the Settlement and were documented in written objections to the District Court and reiterated at the oral fairness hearing on November 6, 2025. 2-WhittyER-207–20, 227–32.

### A. Roster Limits Caused Immediate, Irreparable Harm

Roster limits restrict the number of available roster spots and, as a result, reduce athletic participation opportunities and the number of athletes eligible for scholarships—they function as a de facto "*scholarship cap*." 3-WhittyER-433, 521. By eliminating opportunities to compete and obtain the educational benefits associated with Division I athletics, roster limits have produced the very harms objectors warned would result from the implementation of the Injunctive Relief.[7] 3-WhittyER-435–36, 461–70; 5-WhittyER-989–93.

---

[7] Class Counsel inaccurately claims that only 73 class members, less than 0.1% of the Settlement Class submitted timely objections. ECF 29.1 at 15. That figure does not account for over 100 objections to the Fourth Amended Settlement and Second Amended Injunctive Relief submitted on April 21, 2025. ECF 26.1 at 24–25.

The District Court approved the Injunctive Relief based on two central assumptions regarding roster limits. First, it assumed that Designated Student-Athlete ("DSA") protections would mitigate the harms associated with roster reductions. Second, it credited projections that eliminating scholarship caps would create new scholarship opportunities to offset roster-limit harms. Subsequent events proved both assumptions wrong. 1-WhittyER-39, 44, 176; 3-WhittyER-549. The record now demonstrates that DSA protections failed in practice and that roster limits produced scholarship losses rather than scholarship gains. 2-WhittyER-210, 232, 244, 272–74.

### 1. DSA Protections Failed to Prevent Harm

The District Court relied heavily on the DSA exemption as a safeguard, concluding that DSAs retained "what they had prior to the roster limits provisions being implemented, which was the opportunity to be on a roster at the *discretion* of a Division I school." 1-WhittyER-177. But discretion is not protection. DSA status guarantees neither a tryout, a roster spot, nor a scholarship, and it does not prevent a university from cutting an athlete or eliminating an entire team. Events following final approval confirmed that the District Court's reliance on these exemptions was misplaced.

Contrary to Appellees' assertion that Hinds Macdonald's injuries were not caused by the Injunctive Relief, the causal connection is direct. ECF 31.1 at 48. After

10

the spring semester, his coach called him to inform him that his roster spot was eliminated due to the Settlement. The District Court assumed that DSA protections would mitigate such harms. 1-WhittyER-176–78. They did not. Hinds Macdonald never received DSA status, was denied an opportunity to compete for a roster spot, pressured to enter the transfer portal, and ultimately lost his athletic scholarship at Long Island University. ECF 20.1 at 35–37.

The Settlement required schools to identify DSAs in "*good faith*" and provide lists to Class Counsel, who were authorized to review designations and "*ensure that any inaccuracies are corrected promptly*." 1-WhittyER-178. Yet when Hinds Macdonald alerted both the District Court and Class Counsel that he had not received DSA status, Class Counsel failed to respond to his inquiries or take corrective action. ECF 31.1 at 29; WhittyFER-30–39. The failure of both the university and Class Counsel to provide or enforce DSA protections demonstrates that the exemption offered no meaningful safeguard—and underscores the inadequate representation afforded to Injunctive Relief Class members whose interests depended on Class Counsel's enforcement.

Hinds Macdonald's experience was not an isolated incident. Laudermilch informed the District Court that numerous DSAs at Liberty University lost roster spots, confirming that DSA status provided no practical protection. 2-WhittyER-232. The same pattern emerged at Cal Poly. Incoming and current student-athletes

11

with DSA status—Amoroso, Whitty, Iannaccone, and Leight—lost their roster spots when the university eliminated the swimming program due to the financial pressures created by the Settlement. 2-WhittyER-208–11, 274–78, 288–300. The harm arose from program elimination—student-athletes reasonably expected roster spots—but DSA status offers no protection in that scenario. For incoming freshmen, the timing made it impossible to secure admission and a roster spot at another comparable school—a foreseeable harm the District Court itself raised with Appellees during the April 2025 hearing. 3-WhittyER-517–18.

Critically, counsel for the NCAA told the District Court at the November 2025 hearing that the DSA construct was never intended to "apply to folks who are on teams that were cut." 2-WhittyER-226. That admission exposes the loophole: student-athletes harmed by program eliminations receive no protection from the DSA exemption unless they transfer to another school—an outcome that undermines the basic principle of being a *student-athlete*, a student first, whose academic development and institutional commitments should not be uprooted simply because the team is cut. 2-WhittyER-275–78.

The evidence before the District Court showed that the DSA exemption functioned as a discretionary label rather than an enforceable protection. By treating that exemption as an adequate safeguard while disregarding evidence that DSAs remained vulnerable to the very harms caused by the implementation of roster limits

12

and the financial pressures associated with the Settlement, the District Court abused its discretion.

### 2. The District Court's Assumption of Scholarship Increases was Speculative and Contradicted by the Record

The District Court justified the implementation of roster limits based on the premise that eliminating scholarship caps would expand scholarship opportunities. The Court relied on Dr. Rascher's projections that removing scholarship limits "*would open the door for more than 115,000 additional scholarships annually*" and "may lead to the creation of *tens of thousands of new scholarships* that could potentially be awarded to the class members who lost a roster spot." 1-WhittyER-177. The District Court therefore assumed that any harms caused by roster limits would be offset by "other protections and new benefits." 1-WhittyER-177. But the record shows the opposite: non-revenue sports received few, if any, new benefits and more than 1,000 athletic scholarships have been lost.[8] 3-WhittyER-435–36.

At the April 2025 fairness hearing, Defense Counsel reassured the District Court that moving from scholarship limits to roster limits "*opens the door for schools to expand opportunities,*" offering this shift as a procompetitive rationale. Counsel further promised that "*we guaranteed existing scholarships.*" 3-WhittyER-519–20. But in practice, that assurance was not fulfilled. Both Amoroso and Hinds

---

[8] S. Comm. on Com., Sci. & Transp., *supra* note 4, at 39:24–39:35.

Macdonald lost athletic scholarships following approval of the Settlement—outcomes that directly contradict the District Court's assumption that harms caused by roster limits harms would be offset by expanded scholarship opportunities.

These scholarship losses are particularly significant because the District Court relied on speculative future benefits to justify immediate, concrete harms. Yet the promised benefits were never guaranteed by the Settlement, while the harms materialized almost immediately. The District Court's reliance on the possibility that eliminating scholarship caps "may lead to the creation of tens of thousands of new scholarships," while disregarding evidence of actual scholarship losses suffered by class members, was clearly erroneous and constitutes an abuse of discretion.

## II. THE DISTRICT COURT AND APPELLEES IMPROPERLY SHIFTED TO PROCEDURAL STANDING ARGUMENTS TO AVOID SUBSTANTIVE HARMS

### A. The District Court Never Found that Objectors-Appellants *Whitty et al.* Lacked Standing

Rather than addressing the substantive harms caused by the continuation of the Injunctive Relief, Appellees reframed the objections as a threshold standing issue. They repeatedly argue that Objectors-Appellants lacked standing to object because they were not members of the Incoming Injunctive Relief Class, were not personally aggrieved, or suffered injuries allegedly caused by independent institutional decisions rather than by the Settlement itself. ECF 29.1 at 25–26, 29–33; ECF 31.1 at 48–51.

14

At the November 6, 2025 fairness hearing, Objectors' attorney, Leigh Ernst Friestedt, directly addressed standing and explained the concrete harms suffered by Whitty, Amoroso, and Ernst as well as how those harms were caused by the Settlement.[9] 2-WhittyER-209–14. Laudermilch, acting *pro se*, likewise addressed standing and explained that in a college athletics system where opportunities are "stripped away" and losing a roster spot means "cutting support systems," she should not be the "only one" with standing. 2-WhittyER-231–32. Neither Appellees nor the District Court rebutted these standing arguments during the oral hearing, yet Appellees raised standing objections on appeal. 2-WhittyER-204–235.

Moreover, the District Court never found that *Whitty et al.* lacked standing to object to the continuation of the Injunctive Relief. 1-WhittyER-2–11. The District Court only made a narrow, athlete-specific ruling: Laudermilch lacked standing to challenge the roster limits because she was on a roster and therefore "did not suffer harm" from those particular provisions. 1-WhittyER-8. Class Counsel's assertion that the District Court "*correctly found*" that Objectors-Appellants lacked standing improperly transforms this limited ruling into a broad jurisdictional bar. ECF 29.1 at 27–33. Nothing in the District Court's order supports such an expansive reading.

---

[9] Class Counsel inaccurately state that counsel represented all *Whitty et al.* objectors. ECF 29.1 at 18. Iannaccone, Leight, and Hinds Macdonald did not have counsel at the time of the oral hearing, they retained Friestedt for the appeal.

15

The treatment of recruited student-athlete Ariana Amoroso further illustrates how Appellees attempted to exclude objectors on standing grounds. Class Counsel did not challenge Amoroso's substantive standing. Instead, they raised a procedural objection—arguing that her original objection was defective because it was submitted by her father when she was a minor. WhittyFER-77. That objection challenged the form of the filing, not Amoroso's individual standing. When Amoroso reached majority, she moved for leave to amend and personally pursue the objection. 2-WhittyER-240–41. The District Court granted that motion, curing the procedural issue. WhittyFER-75. Once the defect was cured, Class Counsel did not renew any standing challenge at the fairness hearing, and the District Court never found that Amoroso lacked standing.

Class Counsel's repeated efforts to exclude objectors on standing grounds underscore a pattern of treating substantive objections as procedural defects and reinforce the inadequate representation challenged in this appeal. ECF 20.1 at 43, 59, 62–63. The record shows the District Court did not find that *Whitty et al.* lacked standing to object. Appellees' contrary characterization should be rejected.

### B. The Amended Class Structure Made the "Incoming" Injunctive Relief Class Members' Right to Object Illusory

The Fourth Amended Settlement Agreement redefined the Injunctive Relief Class by dividing it into two groups: "**Current**" and "**Incoming**" Injunctive Relief Class Members. 2-WhittyER-366–67, 382. "Current" members are student-athletes

16

"who competed on, or are competing on, a Division I athletic team prior to Final Approval." They remain class members, but their ability to object ended on January 31, 2025—the first objection deadline—even if they later experienced new harms under the Injunctive Relief. 1-WhittyER-2. "Incoming" members are defined as student-athletes "who will *compete* for the first time on a Division I athletic team after Final Approval." 2-WhittyER-416. Under this amended structure, prospective student-athletes do not become class members until they successfully earn a Division I roster spot.

This bifurcation creates a structural standing dilemma. Current members cannot object to new harms arising from the implementation of the Injunctive Relief, and Incoming members cannot object unless they later earn a Division I roster spot—making their ability to challenge the Settlement contingent on future roster decision left to the unfettered "*discretion*" of a school, rather than any objective or uniform criteria. The result is a class definition that extinguishes rights for one group and makes them contingent on the other, leaving both without meaningful procedural protection.

The timing of the objection deadline compounds this problem. Under the amended definition, a student-athlete becomes an "Incoming" class member only after earning a roster spot, which often occurs after the objection deadline has passed. Last year, the objection deadline for Incoming members was September

17

22, 2025. 1-WhittyER-2; 2-WhittyER-311, 315. This year, the deadline was moved up to **August 11, 2026**—before most schools open and weeks, if not months, before tryouts or roster finalization. WhittyFER-4–10. Because class membership attaches only once a student-athlete secures a roster position, most prospective student-athletes will not become class members until after the objection period closes. By the time they compete for a roster spot, the window to challenge the Settlement has already disappeared. The result is a class structure that renders Incoming members' Rule 23(e)(5) right to object illusory, creating a systemic risk that they will be bound without any meaningful opportunity to challenge the Injunctive Relief.

**Amoroso** and **Whitty**—both recruited student-athletes at Cal Poly—were Injunctive Relief Class members under the original class definition. ECF 20.1 at 26–27. But under the amended class definition, they would not become class members until they "compete for the first time on a Division I team." 2-WhittyER-366–67. When Cal Poly eliminated their team, they lost any opportunity to compete for a roster spot, and the amended definition reclassified them out of the Injunctive Relief Class entirely. The amended class structure ensures that Incoming student-athletes whose programs are eliminated lose standing at the precise moment their injury occurs, making meaningful objection impossible.

18

**Laudermilch** exemplifies the structural standing dilemma. When she first objected and appeared at the April 7, 2025 hearing, she was an Injunctive Relief Class member. 3-WhittyER-466–70, 642–44. But after the District Court approved the Fourth Amended Settlement and Second Amended Injunctive Relief on May 9, 2025, she would become an "Incoming" member only if she made the team at Liberty. 2-WhittyER-345–47. Under the amended structure, it was impossible for Laudermilch to ever have standing to object to roster limits.

- If she failed to make the team, she would have been harmed by the roster limits but would not become a class member.

- If she made the team, she would become a class member but would no longer be harmed.

Once the roster decision was made—whether she made the team or not—the Settlement guaranteed she would lose standing either way.[10]

**Ernst**—a Current Injunctive Relief Class member—also faced this standing dilemma. After her initial objection and hearing (now on separate appeal), she and her attorney informed the District Court that female athletes at Vanderbilt and other universities, including Georgia, had lost their $5,980 *Alston* payments and had reduced team budgets as a result of the implementation of the Injunctive Relief. 2-WhittyER-280–81, 212–14. The District Court incorrectly asserted that

---

[10] Laudermilch independently retains standing because her injury occurred during recruiting, before she even had an opportunity to make the team at Liberty. 3-WhittyER-642.

19

Ernst "repeats arguments that were already considered and rejected." 2-WhittyER-3. Ernst did not repeat structural concerns about *Alston* payments; she showed how the Settlement's structure was producing *actual harms* that Current class members were experiencing for the first time. 2-WhittyER-279–87. Ernst's inability to object to new harms, and the District Court's refusal to consider them, constitutes an abuse of discretion.

During the April 2025 hearing, Defense Counsel reassured the District Court that future student-athletes "*are class members*" with a right to object before they are bound by the Settlement. 3-WhittyER-515–16. Appellees now take the opposite position, arguing student-athletes are not class members unless they compete on a Division I team. This standing dilemma deprives absent class members of the procedural protections that Rule 23 and due process guarantee. *See Devlin v. Scardelletti*, 536 U.S. 1, 14 (2002). The District Court's failure to confront these standing defects constitutes an abuse of discretion.

Despite these limitations, *Whitty et al.* have standing to object and to appeal the continuation of the Injunctive Relief. They followed the procedures outlined in Class Notice and filed timely objections. 2-WhittyER-309–17. The District Court chose to hear and overrule their objections at the November 6, 2025 hearing, which preserves standing to appeal the Court's ruling. 2-WhittyER-270–71; WhittyFER-75. Had the District Court believed that Objectors-Appellants lacked standing, it

20

would have dismissed them as non-class members—as it has done with other objectors in the past—but it did not. 1-WhittyER-166.

### C. Article III Standing to Object Differs from Standing to Appeal – *Devlin* Controls

Objectors-Appellants have standing to appeal because they were timely objecting parties. The Supreme Court has made clear that neither Article III nor prudential standing limits the ability of non-intervening objectors to appeal class action settlements. *See Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002). In *Devlin*, the Court held that the inquiry is not about constitutional standing, but about who qualifies as a "party" for purposes of appeal. *Id*. *Devlin* answers that question, "non-named class members . . . who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 572 (9th Cir. 2004).

Here, Objectors-Appellants did exactly what *Devlin* requires—they submitted timely objections and participated in the fairness hearing. Under *Devlin*, what matters is that nonnamed class members are *bound* by the settlement because they must be permitted to appeal its approval when they have objected at the fairness hearing. To hold otherwise would deprive class members of the only mechanism available to protect their interests in a settlement—particularly when a petitioner has no ability to opt out of the Settlement, which is exactly what occurred here. 2-WhittyER-312. Under Rule 23(b)(1), class members are bound without opt-out

21

rights, making an appeal from the approval of the settlement their only means of protecting their rights. As *Devlin* explains, when a class member cannot opt out, the right to appeal becomes essential. *Devlin*, 536 U.S. at 10–11.

Objectors-Appellants' standing is further confirmed by the District Court's own procedural rulings. On April 20, 2026, Class Counsel filed a Motion to Enforce the Settlement. WhittyFER-57–74 Objectors-Appellants filed a Motion to Intervene to protect their rights. WhittyFER-14–39. On June 4, 2026, the District Court denied their motion to intervene. WhittyFER-11–13. Under *Devlin*, that denial is dispositive—objectors whose intervention is denied are precisely the category of litigants who retain the right to appeal without intervening. 536 U.S. at 14. The District Court's denial therefore reinforces, rather than undermines, their appellate standing. *Whitty et al.* are "parties" for purposes of appeal because they objected timely, and the denial of intervention preserved their appellate rights.

## III. THE INJUNCTIVE RELIEF DOES NOT PROMOTE INTERESTS COMMON TO ALL CLASS MEMBERS

The District Court concluded that all class members "share a *common interest* in securing a more competitive market for the labor of Division I student-athletes and in achieving greater compensation." 1-WhittyER-4–5, 179, 181. Appellees similarly claim that the Injunctive Relief creates a "competitive market for athlete compensation and benefits that is equally available to *all* Injunctive Relief Class members," and even if benefits differ, all athletes share a "common interest in

22

eliminating the NCAA's unlawful labor market restraints and creating new compensation and scholarship opportunities." ECF 29.1 at 12, 27, 62–63.

That asserted "common interest" does not exist in practice. While all Injunctive Relief Class members may theoretically benefit from eliminating restrictive NCAA rules, the reality is that only revenue-producing sports receive meaningful compensation. 2-WhittyER-280–81, 285–86. New benefits are not "equally available to all" student-athletes because female athletes are not in the "same factual and legal" position as male athletes, thus making the conflict fundamental. ECF 29.1 at 44–45; *Ward Dixie v. Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010). Appellees have structured a Settlement that excludes Title IX, ensuring that men operate in a deregulated compensation market while women are deprived of the federal antidiscrimination protections that would otherwise guarantee equal treatment, benefits, and participation opportunities. 2-WhittyER-209–14, 227–30, 366–67, 372–74.

Money and benefits flow overwhelmingly to male athletes and are funded by diverting resources away from non-revenue sports. 2-WhittyER-243–65, 272–94, 301–08. As a result, women and Olympic-sport athletes do not share a common interest in the Injunctive Relief—they bear the cost of the new model while receiving only minimal benefits. ECF 20.1 at 49–60. This divergence eliminates any shared common interest and creates an intra-class conflict.

23

### A. Non-Revenue Athletes Seek Opportunities to Participate – Their Interests Differ from Athletes in Revenue-Producing Sports

Non-revenue athletes' interests differ fundamentally from those of revenue-sport athletes. Their primary interest is **participation**—maintaining roster spots, preserving teams, receiving an education, and securing the opportunity to compete in Division I athletics. 2-WhittyER-272–308. Compensation is secondary, and the amounts available to them under the Injunctive Relief are minimal compared to the substantial payments directed to football and men's basketball.

Roster limits and resource diversion decrease opportunities—a reduction in output is anticompetitive. 15 U.S.C. § 1. "Direct evidence of anticompetitive effects of a restraint on trade would be proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Appellees assured the District Court that transitioning from scholarship caps to roster limits "opens the door for schools to *expand opportunities*" and that existing scholarships were "*guaranteed*." 3-WhittyER-519–20. But for many women's and Olympic-sport athletes, that door has closed. Scholarships and *Alston* payments they relied on to subsidize their education have been eliminated, along with roster spots they were promised during recruiting. 2-WhittyER-208–20, 227–32.

The District Court acknowledged during the April 2025 hearing that when student-athletes lose roster spots, they cannot receive any of the billion dollars in

24

compensation and benefits unlocked by changes to NCAA rules. 3-WhittyER-517–18, 521. Appellees' procompetitive rationale—expanded compensation and opportunities—benefits revenue-sport athletes while imposing direct harms on women's and Olympic-sport athletes. For non-revenue sports, the Injunctive Relief does not expand market opportunities; it contracts them. A reduction in output, including participation opportunities, is evidence of anticompetitive effects. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1112 (9th Cir. 2021).

### B. *Cohen v. Brown* Confirms that Participation Opportunities are Legally Protected – Not a Valid Procompetitive Rationale

Appellees rely on *Cohen v. Brown University* to argue that all Injunctive Relief Class members share a "*common interest*" in eliminating the NCAA's restraints and that each athlete has an "*equal opportunity*" to benefit from the new compensation market. ECF 29.1 at 44–47; *Cohen v. Brown Univ.,* 16 F.4th 935, 949–51 (1st Cir. 2021). But that premise only holds in a hypothetical world where the anticompetitive restraint is lifted and antidiscrimination laws apply. In that world, women would receive equal treatment and benefits under Title IX, and a common interest might exist. §§ 1681-1688; § 106.41(c).

That is not the world the Settlement creates. The District Court approved a structure that deliberately excludes Title IX from the past-damages calculation and attempts to circumvent Title IX going forward by routing payments through a third-party payment processor. 3-WhittyER-639; WhittyFER-61, 68. Women cannot

25

share a common interest with the existing Class Representatives for three independent reasons:

1. Women are the largest sub-class, comprising 47% of the class, and bear the greatest proportional harm. 3-WhittyER-441.

2. Title IX provides women a distinct legal protection that the Settlement deliberately circumvents. 3-WhittyER-639; WhittyFER-79–80.

3. The Settlement's structure uniquely harms women by diverting resources away from their teams, reducing participation opportunities, and denying them proportional access to new compensation. 2-WhittyER-208–20, 227–30.

Contrary to Appellees' assertion, these disparities are not the result of "competitive market" forces. ECF 29.1 at 46. The Settlement's design ensures that female student-athletes do not receive anything close to their proportional share of the billions of dollars in new compensation and explains why men are receiving over 90% of new revenue-sharing payments.[11]

The District Court and Appellees attempt to shift responsibility for these disparities to individual schools' *discretion*. ECF 29.1 at 22, 26, 32, 35–37. But educational institutions have never had the discretion to ignore federal antidiscrimination laws—and the Settlement structure invites exactly that result. Their suggestion that women may simply pursue separate litigation is legally

---

[11] Todd Graff, *.66%: What Penn State's Reporting Indicates About the Future of Women's Sports*, Christine Brown & Partners (Feb. 13, 2026), https://www.christinebrownsportslaw.com/news-insights/what-penn-states-reporting-indicates-about-the-future-of-womens-sports.

untenable and confirms the problem. ECF 29.1 at 10; 2-WhittyER-221–23, 228–30. The Injunctive Relief creates a deregulated compensation market for men, while women must rely on external Title IX enforcement to secure equal treatment. A system that applies one set of rules to men and another to women cannot produce a "common interest." *Amchem*, 521 U.S. at 626–27. It entrenches unequal opportunity and creates an intra-class conflict that defeats Appellees' procompetitive rationale.

Ironically, *Cohen* is the landmark Title IX case requiring federally funded institutions to "effectively accommodate the interests and abilities" of women. *Cohen v. Brown Univ. (Cohen II)*, 991 F.2d 888, 892–96 (1st Cir. 1993) (quoting § 106.41(c)(1)). Appellees invoke *Cohen* to argue that Class Representatives adequately represent the Injunctive Relief Class. ECF 29.1 at 44–47. But *Cohen* involved the opposite circumstances.

Twenty years after the original settlement, the question in *Cohen* was whether the same class representatives remained adequate. *Cohen*, 16 F.4th at 946. Applying *Sosna v. Iowa*, the First Circuit asked whether the representatives' "interests meaningfully conflict with those of the class" and whether they remained "competent champions of the cause." *Id.* at 947; *see Sosna v. Iowa*, 419 U.S. 393, 403 (1975). The court found no substantial intraclass conflict because all women shared a common interest in enforcing Title IX and limiting Brown's discretion to eliminate varsity teams. *Cohen*, 16 F.4th at 950–51. The only dispute concerned how

27

long Brown must comply—not whether Title IX protections applied. ECF 29.1 at 46.

Those facts bear no resemblance to this case. Here, the Class Representatives were never subject to the ongoing regulatory regime of the Injunctive Relief, never lost roster spots, scholarships, team funding, or *Alston* payments. They "*don't have skin in the game.*" *Cohen*, 16 F.4th at 946. Their interests meaningfully conflict with those of current and future student-athletes who are harmed by the Settlement's structure. In *Cohen*, participation opportunities were the common interest. Here, the Injunctive Relief makes compensation the central interest—a shift that reflects the new world of college athletics where money is prioritized over the educational experience and equitable opportunity of student-athletes.

Moreover, in *Cohen*, the First Circuit emphasized Brown's "evolving response to Title IX" and its leadership's "steadfast commitment to gender equity in athletics." *Cohen*, 16 F.4th at 952. This is the polar opposite of what is happening here, where the District Court and Appellees direct women to pursue separate Title IX litigation in another forum—a position that itself confirms inadequacy of representation and constitutes an abuse of discretion. 1-WhittyER-4; ECF 29.1 at 10. The District Court's refusal to acknowledge ongoing Title IX violations—and the role the Settlement and Injunctive Relief play in perpetuating them—underscores the very inadequacy that requires vacatur.

28

**IV. TITLE IX CLAIMS ARE NOT MERITLESS – THE INJUNCTIVE RELIEF PERPETUATES SEX-BASED DISCRIMINATION AND VIOLATES THE CONSTITUTION**

On July 5, 2026, NCAA President Charlie Baker appeared on *Face the Nation* and identified what he viewed as the most significant developments in the NCAA's 100-year history: (1) the creation of the NCAA, (2) **the enactment of Title IX**, and (3) the implementation of revenue-sharing for student-athletes.[12] Yet Appellees simultaneously contend that Objectors-Appellants' Title IX claims are meritless, and female student-athletes who believe their Title IX rights have been violated should file separate lawsuits. ECF 29.1 at 37–40; ECF 31.1 at 13, 28, 42, 54–56.

That contradiction underscores why the Settlement is not fair, reasonable, or adequate under Rule 23. The NCAA invokes Title IX when it serves its public narrative, but when confronted with evidence that the Settlement violates Title IX, Appellees insist that any disparities are merely the result of individual school decisions. ECF 29.1 at 10, 37; ECF 31.1 at 55. That position is legally untenable. Educational institutions do not have discretion to ignore federal civil rights laws, and Appellees cannot evade responsibility by shifting Title IX enforcement onto women. *See* § 106.41(a); 2-WhittyER-221–22.

---

[12] Charlie Baker, *Face the Nation with Margaret Brennan*, CBS News (July 5, 2026) https://www.cbsnews.com/news/charlie-baker-ncaa-president-face-the-nation-transcript-07-05-2026/.

Federal civil rights law requires recipients of federal financial assistance—including universities and athletic departments—to administer financial assistance and benefits in compliance with Title IX. *See* § 106.41(a); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998). Title IX requires that compensation, benefits, and participation opportunities provided in connection with athletics be equitable between the sexes. 34 C.F.R. § 106.41(c).

Instead of ensuring that the Settlement complies with antidiscrimination laws, Appellees argue against every Title IX violation raised by Objectors-Appellants and insist that female student-athletes must file separate lawsuits to vindicate their rights. ECF 29.1 at 10, 20-21, 26, 37–40; ECF 31.1 at 13, 28, 33-34, 42, 54–56. Rather than remedying unlawful sex-based disparities, the Injunctive Relief entrenches them—a structural conflict that defeats adequacy of representation and exemplifies how the Settlement is not fair, adequate, or reasonable under Rule 23. 2-WhittyER-423.

### A. Due Process Guarantees a Right to Object and Appeal – It Does Not Require an Objector to File a Lawsuit

Due Process guarantees unnamed class members the right to object to a settlement without being required to opt out and pursue separate litigation. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812–13 (1985). Rule 23 likewise requires that class members be given notice of a proposed settlement and an opportunity to object. Fed. R. Civ. P. 23(e)(5)(A). The Ninth Circuit similarly recognizes that unnamed class members may object to settlements and may appeal

30

adverse ruling on their objections without opting out or formally intervening. *See Churchill Vill.*, 361 F.3d at 572–73.

The District Court and Class Counsel argue "this is not a Title IX case," so dissatisfied objectors should have opted out and pursued separate lawsuits. ECF 29.1 at 10, 26; 1-WhittyER-4; 2-WhittyER-221–23. But due process and Rule 23 do not confine objections to damages, nor do they require an objector to opt out to preserve her rights. Courts have long recognized that an unnamed class member's right to object extends to any aspect of a proposed settlement, and she may do so on behalf of herself, a subclass, or an entire class. Fed. R. Civ. P. 23(e)(5)(A); *see Carter v. City of L.A.*, 224 Cal. App. 4th 808, 822–24 (2014). The Supreme Court has also confirmed that objections may challenge all aspects of a settlement without opting out. *See Devlin*, 536 U.S. at 7; *see also Churchill Vill.*, 361 F.3d at 572.

Accordingly, the District Court abused its discretion by accepting Appellees' premise that Objectors-Appellants should pursue separate litigation rather than invoke their due process right to object within the Rule 23 framework. Due process does not require unnamed class members to file a new lawsuit to preserve their rights. By suggesting that Objectors-Appellants should sue and overruling their objections, the District Court encouraged additional litigation instead of performing the fairness review Rule 23 requires. 1-WhittyER-4. The District Court failed to safeguard Objectors-Appellants' due process rights and abused its discretion.

31

### B. A Recipient of Federal Financial Assistance Cannot Violate Federal Antidiscrimination Laws – Spending Clause

Title IX prohibits sex-based discrimination in "any education program or activity receiving federal financial assistance." § 1681(a). Congress enacted Title IX pursuant to its authority under the Spending Clause, which operates as a contract between the federal government and recipients of federal funds; in exchange for funding, recipients must comply with federally imposed conditions. U.S. Const. art. I, § 8, cl. 1. The Supreme Court has long held that Title IX's nondiscrimination requirements attach as binding conditions to any federally funded education program or activity, including intercollegiate athletics. § 106.41(c); *see N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 516 (1982).

Institutions voluntarily accept billions of dollars in federal financial assistance in exchange for a promise that they will not discriminate based on sex. *See Gebser*, 524 U.S. at 286 (1998) (Title IX operates as "an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds"). A Settlement structure that allows institutions to implement revenue-sharing programs that perpetuate sex-based disparities frustrates the conditions Congress attached to federal funding and undermines Title IX's core purpose—to prevent federal resources from supporting discriminatory practices. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) (describing Title IX's goals as "avoid[ing] the use of resources to support

32

discriminatory practices" and "provid[ing] individual citizens effective protection against those practices").

The District Court abused its discretion by approving a Settlement structure that it knew produced sex-based disparities. 2-WhittyER-423. *Whitty et al.'s* Opening Brief explained the Past Damages were facially discriminatory, and the Injunctive Relief replicated and exacerbated those disparities. ECF 20.1 at 25–26, 54–55. By continuing an Injunctive Relief that entrenches sex-based inequities in federally funded athletics programs, the District Court sanctioned a structure that frustrates Title IX's nondiscrimination mandate and violates the Spending Clause conditions Congress attached to federal financial assistance. 2-WhittyER-211–14, 227–30, 280–81, 285–86. The District Court's failure to prevent federal resources from supporting discriminatory practices constitutes an abuse of discretion.

## C. The District Court is a State Actor and Violated the Equal Protection Clause by Continuing Sex-Based Discrimination

Judicial approval and continuation of the Settlement constitutes state action. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 179 (1972) (state action may rise from "rulings of administrative and regulatory agencies as well as from legislative or *judicial action*.") (emphasis added); *See* U.S. Const. amend. XIV; *Shelley v. Kraemer*, 334 U.S. 1, 14 (1948) ("[T]he action of state courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment."). The Equal Protection Clause prohibits a state actor

33

from engaging in sex-based discrimination that is not substantially related to important government interests. *Craig v. Boren*, 429 U.S. 190, 197 (1976); *United States v. Virginia*, 518 U.S. 515, 541-42 (1996). Accordingly, the District Court has a constitutional duty to safeguard Objectors-Appellants' rights by effectuating the Equal Protection principles incorporated in Title IX. *See Hurd v. Hodge*, 334 U.S. 24, 43–46 (1948) (holding the enforcement of a discriminatory agreement by a federal court was state action facilitating a violation of civil rights law); *Stone v. City & County of San Francisco*, 968 F.2d 850, 861 (9th Cir. June 25, 1992) (federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights).

Objectors-Appellants detailed in their Opening Brief the sex-based disparities in the Past Damages and continuation of those disparities in the Injunctive Relief. ECF 20.1 at 25–26, 54–55. Katherine Ernst presented new evidence showing that female student-athletes were losing their $5,980 *Alston* payments while more than 90% of revenue-sharing payments were going to male student-athletes. 2-WhittyER-280–81, 285–86. Appellees had expressly assured the District Court that it would retain the power to modify or terminate the Injunctive Relief, 3-WhittyER-511–13, yet the Court later held that it "does not have the power to modify" the Settlement or Injunctive Relief. 1-WhittyER-4. By choosing to continue an Injunctive Relief that perpetuates sex-based discrimination—despite being told it had the authority to

34

change it—the District Court exercised judicial authority, which constitutes state action under the Fourteenth Amendment. *See* U.S. Const. amend. XIV. In doing so, the District Court violated the Equal Protection Clause and failed its constitutional duty to prevent federal judicial power from being used to sustain discriminatory practices. This constitutional error constitutes a per se abuse of discretion.

## V. PENDING FEDERAL LEGISLATION AND NCAA RULES ARE DIRECTLY RELEVANT TO THE INJUNCTIVE RELIEF

Contrary to Appellees' assertion, pending Congressional legislation and NCAA/Conference rules are directly relevant to whether the District Court abused its discretion. ECF 29.1 at 40. Article 7 ("Legislation") of the Injunctive Relief requires Class Counsel to "use reasonable efforts to support" any federal or state legislation "implementing/codifying this Injunctive Relief." 1-WhittyER-53. Objectors-Appellants' Opening Brief explained that pending legislation could alter or supersede core components of the Injunctive Relief and significantly weaken Title IX protections for women. ECF 20.1 at 67–68. New NCAA/Conference rules affecting student-athlete eligibility and benefits are likewise subject to Class Counsel's review and fall within the District Court's continuing, exclusive jurisdiction over all matters related to the Settlement. ECF 29.1 at 40; 1-WhittyER-14, 115. Because both legislation and new rules operate within a framework overseen by Class Counsel and the District Court, their foreseeable consequences are directly relevant to whether the District Court abused its discretion.

### A. The Protect College Sports Act, is not "Rumored" — It is Legislation Directly Tied to the Injunctive Relief

Since the approval of the Settlement on June 6, 2025, Congress has introduced multiple pieces of legislation to codify the Injunctive Relief—first the SCORE Act, now the Protect College Sports Act ("PCSA'). SCORE Act, H.R. 4312, 119th Cong. (July 24, 2025); Protect College Sports Act, S. 4668, 119th Cong. (June 24, 2026). These are not "rumored actions;" they are foreseeable legislative consequences the District Court was required to evaluate because the Settlement itself requires Class Counsel to support such legislation. ECF 29.1 at 40; 1-WhittyER-53.

Although the specific provisions of the PCSA are still being renegotiated, its structure creates legal mechanisms that would severely weaken Title IX protections. Section 125—misleadingly titled "Protection of Women's and Olympic Sports," would freeze Title IX compliance at a discriminatory baseline and authorize future waivers by delegating enforcement to athletic associations that argue they are not subject to Title IX. Protect College Sports Act, S. 4668, 119th Cong. §125(b)–(c); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466–70 (1999). Other provisions raise similar concerns, including Section 119, which omits any private right of action for Title IX or civil rights claims, and Section 120, which provides whistleblower protections that do not cover female student-athletes reporting Title IX violations. *Id.* §§119–120.

36

Because this legislation is actively evolving at the time of filing, its full impact is uncertain. What is clear, however, is that the pending legislation is directly related to the Injunctive Relief and threatens to weaken Title IX and women's ability to enforce their civil rights. Appellees' assertion that women's remedy is simply a right to sue cannot be reconciled with the reality that Congress is simultaneously rewriting the underlying rules of Title IX in ways that would make such lawsuits ineffective or impossible.

## CONCLUSION

For the foregoing reasons, the District Court's order to continue the Injunctive Relief should be vacated. If Class Counsel is unable to adequately represent the Injunctive Relief Class, the Court must appoint new counsel.

Date: July 29, 2026

| | |
|---|---|
| */s/ Leigh Ernst Friestedt* | */s/ Jeffrey E. Faucette* |
| Leigh Ernst Friestedt | Jeffrey E. Faucette |
| EQUITY IX, LLC | SKAGGS FAUCETTE LLP |
| 40 Mercer St., Suite 15 | 505 Montgomery St., 11th Floor |
| New York, NY 10013 | San Francisco, CA 94111 |
| (917) 513-5541 | (415) 874-3181 |
| leigh@equityix.com | jeff@skaggsfaucette.com |

*Attorneys for Objectors-Appellants:* Piper Whitty, Ariana Amoroso, Katherine McCabe Ernst, Scott Iannaccone, Abigail Leight, Reid Hinds Macdonald

37

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**  25-3722, 25-3835, 25-4137, 25-1450, 25-4190

I am the attorney or self-represented party.

**This brief contains 8,195 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).
I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[x] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [x] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Leigh Ernst Friestedt   **Date** July 29, 2026

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 15. Certificate of Service for Electronic Filing**

**9th Cir. Case Number(s)** 25-3722, 25-3835, 25-4137, 25-4150, 25-4190

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[  ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[x] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

> Gracelyn Laudermilch, glaudermilch@gmail.com

**Description of Document(s)** *(required for all documents)***:**

> Reply Brief: Piper Whitty, et al., Objectors–Appellants
> Further Excerpts of Record

**Signature**   s/ Leigh Ernst Friestedt   **Date** July 29, 2026